**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(ALEXANDRIA DIVISION)**

| | | |
|---|---|---|
| HEIDE M. ATWOOD, *individually and on behalf of all others similarly situated*, | ) | Case No. |
| Plaintiff, | ) | |
| v. | ) | CLASS ACTION COMPLAINT |
| BLACKBAUD, INC., | ) | **JURY TRIAL DEMAND** |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff HEIDE M. ATWOOD, individually and on behalf of all others similarly situated, brings this action against BLACKBAUD, INC. ("Blackbaud" or "Defendant") to obtain damages, restitution and injunctive relief for the Class, as defined below, from Defendant. Plaintiff makes the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## NATURE OF THE ACTION

1. This class action arises out of the May 2020 data breach wherein Blackbaud failed to protect the personal data of approximately three million people (the "Data Breach"), including the donors and patients of Inova Health System ("Inova"). Inova, a healthcare system client of Blackbaud's, is Northern Virginia's leading nonprofit healthcare provider, serving more than two million individuals annually through its network of hospitals, primary and specialty care practices, emergency and urgent care centers, and outpatient services.[1] Over one million Inova patient's and donor's personal information was exposed during the Data Breach.[2]

---

1 *See* https://www.inova.org/about-inova (last accessed October 15, 2020).

2 *See https://www.fiercehealthcare.com/tech/inova-health-system-hit-by-software-vendor-breach-impacting-1m-people* (last accessed October 15, 2020).

2. Blackbaud bills itself as the world's leading cloud software company, managing, maintaining, and securing the data and servers of nonprofits, foundations, companies, education institutions and healthcare organizations, including Inova (collectively, the "Clients").

3. Blackbaud, which serves millions of users in over 100 countries and generated $900 million in revenue in 2019, is hired by its Clients to safeguard the personally identifiable information ("PII") and Plaintiff's Private Health Information (or "PHI"). of patients, employees, customers and donors of its Clients.[3]

4. Blackbaud's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect the PII and PHI of those affected resulted in a ransomware attack that exposed, among other things: names, addresses, phone numbers and email addresses; dates of birth; demographic information; Social Security numbers; educational history; healthcare information; insurance information and coverage; photo identification; employer information; donor contribution information; and other information that may be deemed necessary to provide health care.

5. Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Blackbaud's inadequate safeguarding of Class Members' PII and PHI that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

6. Defendant maintained the PII and PHI in a reckless manner. In particular, the PII and PHI was maintained on Blackbaud's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for

[3] https://investor.blackbaud.com/static-files/9cd70119-4e13-4d47-b068-3c228c580417 (September 26, 2020).

improper disclosure of Plaintiff's and Class Members' PII and PHI was a known risk to Blackbaud, and thus Blackbaud was on notice that failing to take steps necessary to secure the PII and PHI from those risks left that property in a dangerous condition.

7. Defendant disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard customer PII; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

8. Plaintiff's and Class Members' identities are now at risk because of Blackbaud's negligent conduct since the PII and PHI that Blackbaud collected and maintained is now in the hands of data thieves.

9. Armed with the PII and PHI accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

10. As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

11. Plaintiff and Class Members may also incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

12. By her Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII and PHI was accessed during the Data Breach.

13. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Blackbaud's data security systems, future annual audits, and adequate credit monitoring services funded by Blackbaud.

14. Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence *per se*, (iii) breach of express contract, (iv) breach of implied contract, (v) breach of fiduciary duty and, (vi) violation of State Data Breach Statutes.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is in the millions, many of whom have different citizenship from Defendant, including the named Plaintiff here.

16. This Court has personal jurisdiction over Defendant because Blackbaud intentionally avails itself of the laws of this District to render the exercise of jurisdiction by this Court just and proper.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and has caused harm to Plaintiff and Class members residing in this District.

## PARTIES

18. Plaintiff Heide M. Atwood is a resident and citizen of Manassas, in the County of Prince William, Virginia.

19. Plaintiff Atwood's Private Information was compromised as a direct and proximate result of the Data Breach.

20. While the compromise of Plaintiff Atwood's information was known to Defendant as early as May of 2020, she did not receive a Notice informing her that her personal data was exposed until September 9, 2020. *See* Exhibit A.

21. Defendant Blackbaud is a Delaware corporation with its principal place of business on Daniel Island, Charleston County, South Carolina.

22. Defendant manages, maintains, and provides cybersecurity for the data obtained by its clients who are, schools, non-profit companies, and healthcare organizations including Inova, which maintained Plaintiff's Private Information.

## STATEMENT OF FACTS

23. Founded in 1982, Blackbaud is a publicly traded, global provider of cloud software and services designed for non-profit organizations. Among the services it provides, Blackbaud offers Database Management, including data import and export for nonprofits, foundations, corporations, education institutions, and healthcare organizations. Blackbaud hosts

data and provides software service for approximately 35,000 non-profits worldwide, including Trinity Health.[4]

24. Blackbaud is headquartered in Charleston, South Carolina and has operations in the United States, Australia, Canada, Costa Rica and the United Kingdom.[5] In 2019, Blackbaud earned revenues of approximately $900 million.[6]

25. In the ordinary course of doing business with Defendant's clients, individuals are regularly required to provide Defendant's Clients with sensitive, personal and private information that is then stored, maintained, and secured by Defendant. This information includes or may include:

- Name, address, phone number and email address;
- Date of birth;
- Demographic information;
- Social Security numbers;
- Credit card account numbers;
- Bank account numbers;
- Educational history;
- Healthcare information;
- Insurance information and coverage;
- Photo identification;
- Employer information;
- Donor contribution information; and
- Other information that may be deemed necessary to provide care

---

4 *See* https://www.crunchbase.com/organization/blackbaud (last accessed October 15, 2020).

5 *See* *https://investor.blackbaud.com/news-releases/news-release-details/blackbaud-announces-2019-fourth-quarter-and-full-year-results#:~:text=Financial%20Outlook,share%20of%20%242.20%20to%20%242.35* (last accessed October 15, 2020).

6 *Id*.

26. Due to the highly sensitive and personal nature of the information Defendant maintains, manages, and secures, Defendant has represented to its clients that it will keep that information secure.

27. Blackbaud's Privacy Policy North America ("Privacy Policy") expressly applies as follows:

> At Blackbaud, we are committed to protecting your privacy. This Policy applies to Blackbaud's collection and use of personal data in connection with our marketing and provision of the Blackbaud Solutions, customer support and other services (collectively, the "Services"), for example if you are a customer, visit the website, interact with us at industry conferences, or work for a current or prospective customer of the Services.
>
> If you're a constituent, supporter, patient or student of one of our customers, to which we provide the Services, your data will be used in accordance with that customer's privacy policy. In providing the Services, Blackbaud acts as a service provider and thus, this Policy will not apply to constituents of our customers.[7]

28. Despite such representations and promises, Blackbaud failed to adequately secure and protect the personal information of healthcare organizations and their patients by allowing the Private Information to be copied and potentially used or sold at a later date.

29. As a condition of receiving medical care and treatment at the facilities of Blackbaud's healthcare Clients, patients such as Plaintiff and the Class Members relinquish their highly sensitive personal information. Blackbaud's healthcare Clients in turn entrust Blackbaud with this information.

30. In addition, the Health Information Portability and Accountability Act (HIPPA) imposes upon Blackbaud additional obligations to secure patient users' information for their healthcare Clients.

---

[7] https://www.blackbaud.com/company/privacy-policy/north-america (last accessed October 15, 2020).

31. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and PHI.

32. Blackbaud's Clients, Plaintiff and the Class Members relied on Blackbaud to keep their PII and PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***The Data Breach***

33. On July 16, 2020, Blackbaud notified Inova of a data security incident which had compromised the PII and PHI of Inova's donors and patients. According to Blackbaud itself, the incident involved a ransomware attack on its systems that lasted more than three months: from February 7 to May 20.

34. In May of 2020, Blackbaud discovered a ransomware attack that attempted to "disrupt business by locking companies out of their own data and servers."[8] According to Blackbaud's own statement, "[p]rior to our locking the cybercriminal out, the cybercriminal removed a copy of a subset of data from our self-hosted environment."[9]

35. Despite having knowledge of the attack as early as May 2020, Blackbaud did not notify its affected Clients until July 2020 of the potentially compromised data.

36. According to Inova, they were not informed of the data breach until July 16, 2020 and it wasn't until on or around September 9, 2020 that Trinity Health sent out notices to Plaintiff and other affected individuals whose information was exposed by the Data Breach. (*See* September 9, 2020 Inova Notice Letter, attached hereto as Exhibit A).

---

8 https://www.blackbaud.com/securityincident (last accessed October 15, 2020).

9 *Id.*

37. Inova informed Plaintiff, who was a patient of Inova, that her "information removed by the threat actor may have contained some of your personal information, including your full name, address, date of birth and phone number." (Ex. A).

38. Blackbaud did not have a sufficient process or policies in place to prevent such cyberattack, which is evident by its own statements that it has "already implemented changes to prevent this specific issue from happening again."[10]

39. And despite Blackbaud's representations that the extracted files were destroyed after it paid a ransom to the data thieves, it is not reasonable for Blackbaud to rely on the word of criminals that Plaintiff's and Class Members' information was actually destroyed. Further, upon information and belief, Plaintiff and Class Members cannot be assured that their Social Security numbers, Bank Account numbers, and Credit Card numbers were not also accessed and retained by the data thieves.

40. Despite its failure to protect the sensitive date with which it was entrusted, Blackbaud has failed to offer its Clients or their patients any remedy, including credit monitoring.

***<u>Prevalence of Cyber Attacks and Susceptibility of the Data Storage Industry</u>***

41. Data breaches have become widespread. In 2016, the number of U.S. data breaches surpassed 1,000, a record high and a forty percent increase in the number of data breaches from the previous year. In 2017, a new record high of 1,579 breaches were reported, representing a 44.7 percent increase over 2016. In 2018, there was an extreme jump of 126 percent in the number of consumer records exposed from data breaches. In 2019, there was a 17

10 https://www.blackbaud.com/securityincident (last accessed October 15, 2020).

percent increase in the number of breaches (1,473) over 2018, with 164,683,455 sensitive records exposed.[11]

42. What's more, companies in the business of storing and maintaining PII and PHI, such as Blackbaud are among the most targeted—and therefore at risk—for cyber-attacks.[12]

43. Defendant was well-aware that the PII and PHI they collect is highly sensitive, and of significant value to those who would use it for wrongful purposes.

44. Personally identifiable information is a valuable commodity to identity thieves. As the FTC recognizes, with PII and PHI identity thieves can commit an array of crimes including identify theft, medical and financial fraud.[13] Indeed, a robust "cyber black market" exists in which criminals openly post stolen PII and PHI on multiple underground Internet websites.

45. The ramifications of Blackbaud's failure to keep Plaintiff's and Class Members' PII and PHI secure are long lasting and severe. Once PII and PHI is stolen, fraudulent use of that information and damage to victims may continue for years.

46. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding PII and PHI and of the foreseeable consequences if its data security

---

[11] *See* https://www.idtheftcenter.org/identity-theft-resource-centers-annual-end-of-year-data-breach-report-reveals-17-percent-increase-in-breaches-over-2018/ (last accessed October 15, 2020).

[12] *See* https://www.cshub.com/attacks/articles/top-8-industries-reporting-data-breaches-in-the-first-half-of-2019 (last accessed October 15, 2020).

[13] Federal Trade Commission, *Warning Signs of Identity Theft,* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed October 15, 2020).

systems were breached, including, the significant costs that would be imposed on customers as a result of a breach.

47. Defendant breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard the computer systems and data that held the stolen PII and PHI. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect consumers' PII and PHI;

c. Failing to properly monitor the data security systems for existing intrusions, and;

d. Failing to ensure that its agents and service providers with access to Plaintiff's and Class Members' PII and PHI employed reasonable security procedures;

***<u>Defendant Failed to Comply with FTC Guidelines</u>***

48. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[14]

---

[14] Federal Trade Commission, *Start With Security*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed October 15, 2020).

49. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses.[15] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

50. The FTC further recommends that companies not maintain PII and PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[16]

51. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[15] https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed October 15, 2020).

[16] Federal Trade Commission, *Start With Security*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed October 15, 2020).

52. Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

53. Defendant was at all times fully aware of their obligation to protect the PII and PHI of consumers. Defendant was also aware of the significant repercussions that would result from their failure to do so.

***Defendant Fail to Comply with Industry Standards***

54. Companies in the business of storing and maintaining PII and PHI, such as Blackbaud, have been identified as being particularly vulnerable to cyber-attacks because of the value of the PII and PHI which they maintain. Cybersecurity firms have promulgated a series of best practices that a minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.[17]

***Plaintiff and Class Members Suffered Damages***

55. The ramifications of Defendant's failure to keep Plaintiff's PII and PHI secure are long lasting and severe. Once PII or PHI is stolen, fraudulent use of that information and damage to victims may continue for years. Victims of data breaches are more likely to become victims of identity fraud.

[17] https://insights.datamark.net/addressing-bpo-information-security/ (last accessed October 15, 2020).

56. The PII and PHI belonging to Plaintiff and Class Members is private, sensitive in nature, and was left inadequately protected by Defendant who did not obtain Plaintiff's or Class Members' consent to disclose such PII and PHI to any other person as required by applicable law and industry standards.

57. The Data Breach was a direct and proximate result of Defendant's failure to: (a) properly safeguard and protect Plaintiff's and Class Members' PII and PHI from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PII and PHI; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

58. Defendant generates revenue of almost a billion-dollar a year and has the resources necessary to prevent the Data Breach, but neglected to adequately invest in data security measures, despite their obligation to protect consumer data.

59. Had Defendant remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into their systems and, ultimately, the theft of PII and PHI.

60. As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information

used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[18]

61. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GOA Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[19]

62. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[20]

63. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

64. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return

---

[18] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013 available at https://www.bjs.gov/content/pub/pdf/vit12.pdf (last accessed October 15, 2020).

[19] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed October 15, 2020) ("GAO Report") (last accessed October 15, 2020).

[20] *See* https://www.identitytheft.gov/Steps (last accessed October 15, 2020).

using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. A study by Identity Theft Resource Center shows the many ways the fraudulent use of personal and financial information can cause harm:[21]




65. What's more, PII and PHI constitutes a valuable property right, the theft of which is gravely serious.[22] Its value is axiomatic, considering the value of Big Data in corporate

---

21 "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last accessed October 15, 2020).

22 *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII and PHI has considerable market value.

66. It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when PII, PHI and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

67. PII, PHI and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

68. There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial accounts for many years to come.

**PLAINTIFF'S & CLASS MEMBERS' DAMAGES**

69. To date, Defendant has done nothing to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach including, but not limited to, the costs of credit monitoring, as well as costs and loss of time they incurred because of the stolen data.

70. Plaintiff and Class Members have been damaged by the compromise of their PII and PHI in the Data Breach as a direct and proximate result of the Data Breach.

71. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

72. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

73. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

74. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII and PHI as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

75. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

76. Plaintiff and Class Members also suffered a loss of value of their PII and PHI when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

77. Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members overpaid for a service that was intended to be accompanied by adequate data security but was not. Part of the price Plaintiff and Class

Members paid to Inova, and which Inova in turn paid to Blackbaud, was intended to be used by Defendant to fund adequate security of Plaintiff's and Class Members' PII and PHI. Thus, Plaintiff and the Class Members did not get what they paid for.

78. Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

79. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Addressing their inability to withdraw funds linked to compromised accounts;

e. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f. Placing "freezes" and "alerts" with credit reporting agencies;

g. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h. Contacting financial institutions and closing or modifying financial accounts;

i. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

80. Moreover, Plaintiff and Class Members have an interest in ensuring that their PII and PHI, which is believed to remain in the possession of Blackbaud, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information is not accessible online and that access to such data is password-protected.

81. Further, as a result of Blackbaud's conduct, Plaintiff and Class Members are forced to live with the anxiety that their PII and PHI —which contains the most intimate details about a person's life —may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

82. As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

83. What's more, Defendant's delay in identifying and reporting the Data Breach caused additional harm. It is axiomatic that "[t]he quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act."[23]

84. Indeed, once a data breach has occurred, "[o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills and

---

[23] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire, https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million (last accessed October 15, 2020).

suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves" (internal citations omitted).[24]

85. Although their PII and PHI was improperly exposed in February 2020, Blackbaud did not notify Inova until July 2020 and Plaintiff was not notified until September 2020, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

86. As a result of Defendant's delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiff and Class Members has been driven even higher.

## CLASS ACTION ALLEGATIONS

87. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class").

88. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was compromised in the February through May of 2020 Data Breach described by Defendant at www.blackbaud.com/securityincident

89. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys,

---

[24] Consumer Reports, The Data Breach Next Door Security breaches don't just hit giants like Equifax and Marriott. Breaches at small companies put consumers at risk, too, January 31, 2019, https://www.consumerreports.org/data-theft/the-data-breach-next-door/ (last accessed October 15, 2020).

successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

90. Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

91. Numerosity. The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, based on information and belief, the class consists of approximately hundreds of thousands of persons whose data was compromised in the Data Breach.

92. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff' and Class Members' PII and PHI;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their PII and PHI;

f. Whether Defendant breached its duty to Class Members to safeguard their PII and PHI;

g. Whether computer hackers obtained Class Members' PII and PHI in the Data Breach;

h. Whether Defendant knew or should have known that their data security systems and monitoring processes were deficient;

i. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant's conduct was negligent;

k. Whether Defendant's conduct was *per se* negligent;

l. Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

m. Whether Defendant was unjustly enriched;

n. Whether Defendant violated the state consumer protection law asserted herein;

o. Whether Defendant failed to provide notice of the Data Breach in a timely manner, and;

p. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

93. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII and PHI, like that of every other Class member, was compromised in the Data Breach.

94. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating Class actions, including data privacy litigation of this kind.

95. Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

96. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

97. Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

98. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant failed to timely notify the public of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII and PHI;

c. Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII and PHI; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the data breach.

99. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach.

## CAUSES OF ACTION
## FIRST COUNT
## NEGLIGENCE
## (On Behalf of Plaintiff & All Class Members)

100. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

101. Defendant's Clients required Plaintiff and Class Members to submit non-public personal information in order to obtain medical, educational, and other services. Defendant had a duty to its Clients, Plaintiff, and Class Members to securely maintain the Private Information collected.

102. Defendant had full knowledge of the sensitivity of the PII and PHI and the types of harm that Plaintiff and Class Members could and would suffer if the PII and PHI were wrongfully disclosed.

103. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII and PHI held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a

breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

104. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its Clients and Users, which is recognized by Defendant's Policy Notice North America, as well as laws and regulations. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a ransomware attack and/or data breach.

105. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

106. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII and PHI.

107. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII and PHI. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII and PHI;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' PII and PHI;

e. Failing to detect in a timely manner that Class Members' PII and PHI had been compromised; and

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

108. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII and PHI would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the industry.

109. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII and PHI would result in one or more types of injuries to Class Members.

110. There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII and PHI and the harm suffered, or risk of imminent harm suffered by Plaintiff and the Class.

111. As a result of Defendant's negligence, Plaintiff and the Class Members have suffered and will continue to suffer damages and injury including, but not limited to: out-of-pocket expenses associated with procuring robust identity protection and restoration services; increased risk of future identity theft and fraud, the costs associated therewith; time spent monitoring, addressing and correcting the current and future consequences of the Data Breach; and the necessity to engage legal counsel and incur attorneys' fees, costs and expenses.

112. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach

113. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**<u>SECOND COUNT</u>**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff & All Class Members)**

114. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

115. Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII and PHI.

116. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII and PHI. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

117. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect customer PII and PHI and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class Members.

118. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se* as Defendant's violation of the FTC Act establishes the duty and breach elements of negligence.

119. Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

120. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

121. Pursuant to the Gramm-Leach-Bliley Act (15 U.S.C. § 6801), Defendant had a duty to protect the security and confidentiality of Plaintiff's and Class Members' PII and PHI.

122. Defendant breached its duties to Plaintiff and Class Members under the Gramm-Leach-Bliley Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII and PHI.

123. Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

124. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

125. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that it was failing to meet their duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII and PHI.

126. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## THIRD COUNT
## BREACH OF EXPRESS CONTRACT

**(On Behalf of Plaintiff and All Class Members)**

127. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

128. Plaintiff and members of the Class allege that they were the direct or third-party beneficiaries of valid and enforceable express contracts, with Defendant (including, *inter alia*, Privacy Policy North America).

129. In fact, Defendant's Privacy Policy North America expressly extends to any "constituent, supporter, patient or student of one of [Blackbaud's] customers…"[25]

130. The valid and enforceable express contracts that Plaintiff, Class Members, and Defendant's Clients entered into with Defendant include Defendant's promise to protect Private Information given to Defendant's Clients and otherwise maintained and secured by Defendant.

131. Under these express contracts, Defendant promised and was obligated to protect Plaintiff's and the Class Members' Private Information. In exchange, Defendant's Clients, Plaintiff, and members of the Class agreed to pay money for these services.

132. The protection of Plaintiff's and Class Members' Private Information were material aspects of these contracts.

133. At all relevant times, Defendant expressly represented in its Privacy Policy North America as follows:

> While no website can guarantee exhaustive security, we maintain appropriate physical, electronic and procedural safeguards to protect your personal information collected via the website. We protect our databases with various physical, technical and procedural measures and we restrict access to your information by unauthorized persons. We also advise all Blackbaud employees about their responsibility to protect customer data

[25] https://www.blackbaud.com/company/privacy-policy/north-america (last accessed October 15, 2020).

> and we provide them with appropriate guidelines for adhering to our company's business ethics standards and confidentiality policies.[26]

134. Defendant's express representations, including, but not limited to, express representations found in its Privacy Policy, formed an express contract requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' Private Information.

135. Consumers of healthcare and education, as well as non-profit donors, value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with healthcare, education, and other institutions private. To customers such as Plaintiff and Class Members, maintenance and security of Private Information that does not adhere to industry standard data security protocols to protect Private Information is fundamentally less useful and less valuable than such services that adhere to industry-standard data security. Plaintiff and Class Members would not have given Defendant's Clients and Defendant their Private Information, and otherwise entered into these contracts with Defendant and/or its Clients as a direct or third-party beneficiary without an understanding that their Private Information would be safeguarded and protected.

136. A meeting of the minds occurred, as Plaintiff and members of the Class provided their Private Information to Defendant and/or its affiliated Clients, and expected protection of their Private Information.

137. Plaintiff and Class Members performed their obligations under the contract, including when they paid for services provided by Defendant's Clients or otherwise donated money.

---

26 *Id.*

138. Defendant materially breached its contractual obligation to protect the Private Information Defendant gathered when the information was accessed or exfiltrated by unauthorized personnel as part of the Data Breach.

139. Defendant materially breached the terms of these express contracts, including, but not limited to, the terms stated in the relevant Privacy Policy. Defendant did not "maintain appropriate physical, electronic and procedural safeguards to protect your personal information," "protect [its] databases with various physical, technical and procedural measures and [we] restrict access to your information by unauthorized persons," or otherwise adequately train employees.

140. Defendant did not comply with industry standards, or otherwise protect Plaintiff' and the Class Members' Private Information, as set forth above.

141. The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

142. As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received services that were of a diminished value to that described in the contracts. Plaintiff and Class Members therefore were damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and the services they received or provided.

143. Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, Plaintiff, the Class Members, or any reasonable person would not have accepted or purchased services from Defendant and/or their Clients which required their providing Private Information.

144. As a direct and proximate result of the Data Breach, Plaintiff and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including without limitation the release, disclosure, and publication of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, out-of-pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

145. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach

**<u>FOURTH COUNT</u>**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff & All Class Members)**

146. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

147. When Plaintiff and Class Members provided their Private Information to Defendant and Defendant's Clients in exchange for Defendant and Defendant's Clients' services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

148. Defendant solicited and invited Class Members to provide their Private Information as part of Defendant's regular business practices, including through its Privacy Policy. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

149. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, and were consistent with industry standards.

150. Plaintiff and Class Members accepted service from, and paid money to Defendant's Clients which was conferred upon Defendant, and through which Plaintiff and Class Members reasonably believed and expected that Defendant would use part of those funds to maintain adequate data security. Defendant failed to do so.

151. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of their implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

152. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

153. Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

154. As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

155. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

156. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**FIFTH COUNT**
**VIOLATION OF STATE DATA BREACH STATUTES**
**(S.C. Code § 1-11-490 (2008) and/or S.C. Code § 39-1-90 (2009))**
**(On Behalf of Plaintiff & All Class Members)**

157. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

158. Defendant owns, licenses and/or maintains computerized data that includes Plaintiff's and Class Members' Private Information.

159. Defendant's conduct, as alleged above, violated the data breach statutes of South Carolina, including, S.C. Code § 1-11-490 (2008) and/or S.C. Code § 39-1-90 (2009) (the "State Data Breach Acts").

160. Defendant was required, but failed, to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the cyber security incident described herein.

161. The Data Breach constituted a "breach of the security system" within the meaning of the State Data Breach Acts.

162. The information compromised in the Data Breach constituted "personal identifying information" within the meaning of the State Data Breach Acts.

163. The State Data Breach Acts require disclosure of data breaches "in the most expedient time possible and without unreasonable delay…."

164. Defendant violated the State Data Breach Acts by unreasonably delaying disclosure of the Data Breach to Plaintiff and other Class Members, whose Private Information was, or was reasonably believed to have been, acquired by an unauthorized person.

165. Upon information and belief, no law enforcement agency instructed Defendant that notification to Plaintiff and Class Members would impede a criminal investigation.

166. As a result of Defendant's violation of the State Data Breach Acts, Plaintiff and Class Members incurred damages as alleged herein.

167. Plaintiff, individually and on behalf of the Class, seek all remedies available under the State Data Breach Acts, including, but not limited to: (a) actual damages suffered by Class Members as alleged above; (b) statutory damages for Defendant's willful, intentional, and/or reckless conduct; (c) equitable relief; and (d) reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment as follows:

a) For an Order certifying this action as a Class action and appointing Plaintiff and her counsel to represent the Class;

b) For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c) For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII and PHI

d) compromised during the Data Breach;

e) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

f) Ordering Defendant to pay for not less than seven years of credit monitoring services for Plaintiff and the Class;

g) For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law, in an amount of at least $5,000,001;

h) For an award of punitive damages, as allowable by law;

i) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

j) Pre- and post-judgment interest on any amounts awarded; and

k) Such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 16, 2020

Respectfully submitted,

/s/ David Hilton Wise

David Hilton Wise, VA Bar No. 30828
John J. Drudi, VA Bar No. 86790
**WISE LAW FIRM, PLC**
10476 Armstrong Street
Fairfax, Virginia 22030
Tel: (703) 934-6377
Fax: (703) 934-6379
dwise@wiselaw.pro
jdrudi@wiselaw.pro
*Attorneys for Plaintiff*